June 1823.   COURT OF APPEALS, (E. S.) JUNE TERM; 1823.

Mason
vs
Harrison & Boggs

MASON *et al.* Lessee, *vs.* HARRISON and BOGGS.

A will thus attested—'In witness whereof I this 14th day of June 181?, declare and publish this to be my last will and testament, in the presence of,' and witnessed by three witnesses, who proved that the testator, at the time of making his will, appeared cool and collected, and perfectly in his seness, and to understand perfectly what he was about; that a pen was put into his hands, and he said he must make his mark; that one of the witnesses assisted him to make his mark, by pressing his fingers to the pen; that the witness did not perceive that the testator made any effort whatever in making the mark, but he appeared to understand perfectly what he was about; that the witnesses and testator were all in the same room when they commenced subscribing their names, but there were some doubts whether he was in the room at the time the last witness had finished subscribing his name. The will was taken by the witnesses to the room in which the testator had been carried, and he was asked if it was his will? and he answered yes. That the testa or, when the witnesses subscribed their names, had his back to the table, and he might have seen them subscribe their names if he had turned his head round; and one of the witnesses believed he could have turned his head or body, but another of the witnesses thought that he could not turn his head; from his debility or weakness. The county court held, that the execution of the instrument of writing was not according to law, and had not been sufficiently proved, and refused to permit it to be read to the jury; and also refused to permit the evidence, given in relation thereto, to be submitted to the jury. On appeal, reversed by the court of appeals.

APPEAL from *Caroline* county court. Ejectment for two tracts of land, one called *Tilghman's Gift*, and the other called *Tilghman's Gift Resurveyed*. The defendants, (the present appellees,) pleaded the general issue. At the trial, the plaintiff deduced a regular title to the lands in question down to *Thomas Mason*, under whom the lessors of the plaintiff claimed title. He then produced an instrument of writing, purporting to be the last will and testament of the said *Mason*, whereby, amongst other things, he devised unto his brother *William Winchester Mason's* children, all of his real estate in fee, and personal estate to be equally divided; and concluded as follows. "In witness whereof I, this 14th day of June 1817, declare and publish this to be my last will and testament in the presence of," and it was attested by three witnesses viz. *Solomon Scott, John Thomas* and *Charles Tilden*, who, by their probate to the instrument, made oath; "that they did subscribe their names as witnesses to the said paper writing; which was signed by *Thomas Mason*, in the presence of them, as his last will and testament; and that the said paper writing is the self-same identical paper that they and each of them did sign as witnesses, as and for the last will and testament of the said *Mason*." The plaintiff then gave in evidence, in relation to the said instrument of writing, by a witness named *Solomon Scott*, that on the 14th of June 1817, he went to the house of *Thomas Mason*, who was very bloody, and appeared badly wounded. That Doctor *John Thomas* observed to him, that *Mason* wanted his will written, and said "stay and write his will, as you can write better than I can." The witness then asked for and obtained pen and paper. About this time *Henry R. Pratt* came into the room, and said "give me the pen, I can write faster than you." *Pratt* then sat down to write the will, and after the preamble was written, Doctor *Thomas* told *Mason* they were ready to write the will. *Thomas* then asked him how he would

have his property devised? He said "give it to my brother's children." The witness then told *Thomas* to ask *Mason* if he meant his brother *William Winchester Mason?* *Mason* said yes. Then *Pratt* wrote down the devise of the real estate in fee, and the personal to be equally divided amongst them. *Mason* then said, "I want to make some other devises." *Pratt* then wrote down, "with the following exceptions." *Thomas* then asked *Mason* what else he wished to dispose of? He replied, give to *Luther Kirtz* the tan-house lot, and all on it. *Thomas* then asked him if they should include the currying shop? And he said "no; begin at the gate, run with the lane to the ditch." *Mason* being asked a second time if the currying shop should be included, answered "no," and seemed somewhat irritated, and said again, "begin at the gate, run with the lane down to the ditch." *Thomas* asked what else he would have disposed of? *Mason* said "give to Mr. *Coursey* old *Sam*, his wife *Miana*, and their youngest child." He was asked, what *Coursey?* And he answered, "*Samuel Coursey*." *Thomas* then asked *Mason* what else? When he said "Mrs. *London* has been long in my service, and done a great deal for me, and was getting old, and I think it right to do something for her," and then said, "give her $100 per annum for life out of my estate." *Mason* was then asked if there was any thing else? He said "no." *Thomas* then asked him who he would have for his executor? and he said "Mr. *Bourke*." He was asked if he meant *William Y. Bourke?* and he replied "yes." *Pratt* having written down these things, took the paper to *Mason*, and read it to him. *Pratt* then took the paper to the table, and wrote the concluding part of it. *Thomas* then told *Mason* the will was ready to be signed, and called for a book to lay the paper on, and then took the paper to *Mason*, he being raised up; *Thomas* put the pen in his hand, but *Mason* did not make any attempt to use the pen. *Thomas* then rose up, and said to the witness, "I wish you would put the pen in his hand." The witness then put the pen in *Mason's* hand, and pointing with his left hand said, "Mr. *Mason* sign your name here," pointing to the place where he was to sign. *Mason* made no attempt to use the pen; the witness looked at him, and seeing his head begin to settle down to his breast, said to Mr. *Coursey* "lay him down, for he is dying." Doctor *Tilden*, who had just be-

JUNE 1823;

Mason
vs
Harrison & Boggs

June 1823.

Mason
vs
Harrison & Boggs

fore come in, had some toddy made, and put it into Mason's mouth with a tea-spoon, and after a short time Mason revived and seemed as well as he was before. It was proposed by some one in the room to take Mason and put him on the bed, but the witness said it would be best for Mason to sign his will where he was. The witness then took the will to Mason, he being raised, and put the pen in his hand, and said to Mason, "sign your name here," pointing to the place where he was to sign. Mason then looked at the witness, and said "I cannot see." His spectacles were got and put on his nose. Mason then said, "I must make my mark." The witness asked those who were standing by if they thought it would be wrong to assist him to make his mark, who said no. The witness then put his hand to that of Mason, and pressed his fingers to the pen, and assisted him to make his mark or cross upon the said instrument of writing, as it appears thereon; but the witness did not perceive, nor does he think that Mason made any effort whatever in making the mark or cross. On being asked, the witness said that Mason's hand lay on his thigh, and was extremely cold. The witness then took the paper to the table, and wrote Mason's name—his christian name on one side of the mark, and his surname on the other, and the word "his" above the mark, and the word "mark" below the mark. The witness then observed to Doctor Thomas and Doctor Tilden, "we must be witnesses," there being no other persons present. The witness then subscribed his name as a witness, and Doctor Thomas and Doctor Tilden did the same, as quick as one could write after the other; and Mason was in the room when they all signed. The witness is certain that Mason was not out of the room when Tilden subscribed his name, and just as Tilden had written his name, they were taking Mason up to carry him out, but he is sure that before he got to the passage door Tilden had written his name. As soon as the witness thought they had got Mason on his bed, he said to Doctor Thomas and Doctor Tilden, "let us take the will into the room to Mason, and ask him if this is his will." The two Doctors, and the witness, then went into the room where Mason lay; as they entered the room he was lying on his back, but just then stretched himself, and turned partly on his left side. The witness then held the paper before him, and asked him "Is this your will?" and he

said "yes." The witness then asked him who should take
charge of the will; shall Doctor *Thomas?* He said "yes."
The will was then folded up and given to Doctor *Thomas.*
When the witness, Doctor *Thomas* and Doctor *Tilden,*
subscribed as witnesses, *Mason* was in the same room; that
the table where the witnesses subscribed their names was
at the opposite side of the room, or the side of an opposite
door, and partly between the door and a window, and
*Mason,* as he lay, might have seen the witnesses subscribe
their names to the will if he had turned his head round;
and the witness believes he could have turned his head or
body, (because he saw him turn in his bed as before stated,)
at the time the witnesses subscribed their names. The bed,
on which *Mason* was lying, was drawn back, and *Mason*
was resting more on his back, than when he was held up.
That all the time when *Mason* was giving out his will as
aforesaid, he appeared cool and collected, and perfectly in
his senses, and to understand perfectly what he was about.
And at the time the said mark was made, *Mason* appeared
to do the same. The plaintiff then further gave in evidence
the same facts by *Henry R. Pratt;* and also gave in
evidence, by Doctor *Charles Tilden,* that he was called on
as a physician to attend *Mason,* &c. After *Pratt* had fi-
nished writing, the instrument of writing was brought to
*Mason* where he sat, either by Doctor *Thomas* or Mr.
*Scott.* He appeared then so much debilitated, that the
witness thought he must sink, and proposed he should be
laid down. He was laid down, and in a short time some
toddy was given to him by the witness, and after a few
minutes a revival appeared to take place, indicated by his
raising his eye-lids, and holding his right hand, and shaking
hands with some person. *Mason* was then raised up, and
the instrument was presented to him again, and the pen
was put into his hand, and he held it in his hand, but he
appeared to be so tremulous in his hand that it was propos-
ed that he should make his mark, and the mark was made
by the assistance of *Solomon Scott.* The paper was then
taken to the table, and the witness and *Solomon Scott* and
Doctor *Thomas,* went to the table, and *Scott* observed we
must be witnesses to the instrument of writing. The wit-
ness and Doctor *Thomas* subscribed the will as witnesses,
and the witness has every reason to believe that *Solomon
Scott* also signed it, because he saw him writing. The wit-

ness signed after Doctor *Thomas.* As soon as the witness got up out of the chair, after he had subscribed his name, he immediately turned round, and did not see *Mason,* he having been removed into another room. It was then proposed by *Scott* that they should go into the other room with the paper, which was agreed to, and they went into the other room, where they found *Mason* lying in the bed partly covered. *Thomas* or *Scott* then held up the paper to him, and asked him "Is this your — (something, for the witness did not recollect whether he said will or not,") to which he replied "yes." *Scott* then asked him if he should give the paper to Doctor *Thomas?* and he answered "yes." Doctor *Thomas* then asked him if he should seal it up there, or take it home and seal it? to which he replied "take it home." *Mason* in a very few minutes after asked for his keys, and they were brought to him. He then told some one to look in one of the drawers, and there they would find some notes, and nearly about the same time Mrs. *Londen* asked him if he remembered $20 that she had loaned him? he said "yes," and then told some one to pay her $20 in specie, saying that there was some specie in one of the drawers. That at the time the witness went to the table to subscribe as a witness, *Mason* was sitting at the front, supported with his back towards the table, and could not see the witness subscribe the paper without turning his head, and he thinks that he could not turn his head from his debility or weakness. That *Mason* died in about three quarters of an hour after he was removed into the other room. The plaintiff then gave in evidence to the jury, by the testimony of *William Hardcastle,* *Robert Hardcastle,* and *Beckington Scott,* certain facts which are not considered to be material. The plaintiff then offered to read to the jury the aforesaid instrument of writing, as the last will and testament of the said *Thomas Mason,* and to submit to them the aforegoing evidence which had been given respecting the same; but the defendants objected to the reading of said instrument to the jury, as not having been executed according to law, and sufficiently proved. The court [*Martin,* Ch. J. and *Robins* A. J.] were of opinion, that the execution of the said instrument was not according to law, and had not been sufficiently proved, and so declared, and refused to permit it to be read to the jury; and also refused to per-

mit the said evidence, given in relation thereto, to be sub‑ JUNE 1822.
mitted to the jury. The plaintiff excepted; and the ver‑
dict and judgment being for the defendants, he appealed
to this court.

<span style="text-align:right">Hayes<br>vs<br>Lusby</span>

The cause was argued before BUCHANAN, EARLE, DOR‑
SEY, and STEPHEN, J. by

*Bullitt* and *Kerr*, for the appellant, and by

J. *Bayly* and *Carmichael*, for the appellees.

JUDGMENT REVERSED, AND PROCEDENDO AWARDED.

————

## COURT OF APPEALS, (E. S.) JUNE TERM, 1823.

### HAYES *vs.* LUSBY.

APPEAL from *Cecil* county court. The cause was ar‑
gued before BUCHANAN, MARTIN, DORSEY, and STEPHEN,
J. by

*Chambers* for the appellant, and by

*Carmichael* and *Gale*, for the appellee *(a)*.

The case is sufficiently stated in the opinion of the court,
which was delivered by

DORSEY, J. The plaintiff had sued forth from *Cecil*
county court a writ of *replevin* against *Thomas Ethering‑
ton*, directed to the defendant, (now appellee,) as sheriff of
*Cecil* county, on which he made return that he had reple‑
vied and delivered the goods and chattels mentioned in the
writ. The present suit was instituted to recover damages
for an alleged false return by the defendant; the plaintiff
complaining that the goods and chattels were not delivered
to him, as stated by the defendant in his return; and on the
trial of the issue three bills of exceptions were taken by
the plaintiff. In the first exception the counsel for the de‑
fendant "prayed the court to direct the jury, that if they
shall believe from the evidence, that after having replevied
and appraised the property mentioned in the schedule re‑
turned with the writ, *Lusby*, the defendant, told *Hayes*,

*(a)* They cited *Gilb: on Distresses*, 281. 1 *Phill. Evid.* 123,
313. 1 *East*, 244. 11 *East*, 298.

*The marginal note:* In the execution of a writ of reple‑
vin, the sheriff must deliver to the plaintiff all the goods replevi‑
ed, and a symbolical delivery is not sufficient, unless with the con‑
sent of the plaintiff; and whether or not the plaintiff did so consent is a
question of fact for the jury. If a sheriff makes a return of process in a parti‑
cular manner, with the consent and approbation of the plaintiff, whether the re‑
turn be true or false, the plaintiff cannot sustain an action for a false
return against the sheriff. A return made by a sheriff to a writ of replevin,
that the goods were replevied and delivered, is prima facie evi‑
dence that the goods were reple‑
vied and delivered according to the
return; and a letter from the she‑
riff to the plaintiff saying he would
be security for the future delivery of
the goods, cannot be considered as
having the double capacity of dis‑
proving the prima facie evidence a‑
rising from the sheriff's return, and establishing a prima facie case, that the goods were not then delivered.