# NOAH R. BRITTINGHAM et al. *vs.* IRA J. BRITTINGHAM.

*Wills—Signature—Subscription by Witnesses—Adjoining Rooms.*

Where the testator's signature is not made in the presence of a witness to the will, the subsequent request by testator to the witness that the latter witness the document or signature may be a sufficient acknowledgment of the signature.     p. 159

An assent by testator that certain parties suggested as witnesses act as such is a sufficient request, to constitute an acknowledgment by testator of his signature.     p. 159

The acceptance by testator, after making his mark by way of signature, of a particular person as a witness, and his direction to such witness to sign as such, was a sufficient acknowledgment of testator's signature.                    p. 160

The requirement that the witnesses sign in testator's presence is satisfied if they do so within testator's unobstructed range of vision, although, if he is able to see it without any material change of position, the fact that he does or does not avail himself of the privilege is immaterial, and a subscription in an adjoining room may be capable of being seen by him for the purpose of the requirement.                    p. 160

It appearing that, though the witnesses signed the instrument in an adjoining room, testator could, by merely turning his head, have seen them while doing so, and that he knew that they were in the act of complying with his request that they sign as witnesses, *held* that they signed in his presence.    p. 160

*Decided January 16th. 1925.*

Appeal from the Circuit Court for Dorchester County (BAILEY and DUER JJ.).

Caveat proceeding by Noah R. Brittingham and others in connection with an alleged will of Benjamin Bassett Brittingham, deceased, to which Ira J. Brittingham, as executor and individually, appeared as caveatee. From rulings in favor of the caveatee, the caveators appeal. Affirmed.

The cause was heard before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*F. Leonard Wailes* and *Franklin Upshur,* with whom was *V. Calvin Trice* on the brief, for the appellants.

*John W. Staton,* with whom were *Calvin B. Taylor, John S. Whaley,* and *Harrington, Harrington & Wallace* on the brief, for the appellee.

ADKINS, J., delivered the opinion of the Court.

The only question in this appeal is the "factum" of an alleged will; that is, was it duly executed as required by article 93, section 323 of the Code, which provides as follows:

> "All devises and bequests * * * shall be in writing and signed by the party so devising or bequeathing, or by some other person for him, in his presence and by his express direction, and shall be attested and subscribed in the presence of the said devisor by two . or more credible witnesses, or else they shall be utterly void and of none effect."

The appellants are the heirs at law of the alleged testator and the appellee is the executor named in the paper writing purporting to be his will.

. There is no objection suggested as to the sufficiency of the form of the attestation clause, but the contention of appellants is that one of the alleged witnesses did not see the testator sign the will or hear him acknowledge it to be his will, and that neither of the witnesses signed in the presence of the testator.

The case was submitted to the jury on the testimony of the caveatee as to the execution of the will, the caveator declining to offer any testimony.

The two bills of exception are:

1. To the overruling of appellant's objection to the offer of the will in evidence.

2. To the granting of caveatee's prayer directing a verdict for the caveatee on all the issues, and refusing the caveators' prayer which asked for a directed verdict in their favor on the ground that there was no evidence legally sufficient to prove the due execution of the paper writing purporting to be the will of Benjamin B. Brittingham, the alleged testator.

The undisputed evidence in the case shows:

That Benjamin B. Brittingham, on March 6th, 1923, made his mark to the paper purporting to be his will. It was

brought to his sick room by a Mr. Keys, who prepared the paper, and was read to Brittingham by his attending physician, Dr. Charles R. Law, at the request of Keys. Brittingham remarked in the hearing of Dr. Law and Minos Brittingham "that is the best will I ever heard read or ever had made," or words to that effect. Keys said it would be necessary to have witnesses, and asked Brittingham if he was satisfied to have Dr. Law and Minos Brittingham as witnesses, and he said yes, it was all right. Minos was standing near the door leading into the sick room from an adjoining room, "right close by the bed," and heard what was said by the testator and also heard the will read. It had to be read rather loud, as testator was slightly deaf, and the reading could be heard in the adjoining room. After the testator signified his assent to have Dr. Law and Minos Brittingham as witnesses, "then," as testified to by Dr. Law, "Mr. Keys, I think, wrote the name of Mr. Brittingham, and he made his mark in our presence."

"Q. In the presence of you and Mr. Minos Brittingham? Ans. In the presence of me and Mr. Minos Brittingham. Q. Where was Mr. Benjamin Bassett Brittingham when he made his mark, was this the paper he made his mark on (indicating paper)? Ans. That is the paper. He was sitting on the side of the bed, nearly to the foot of the bed. Q. How did he come to be sitting on the side of the bed at that time? Ans. He got up and was sitting on the side of the bed when Mr. Keys came in, that is my recollection. Q. He was physically able to move around? Ans. He was physically able to move around and beside him sitting was Mrs. Ira Brittingham, she was sitting beside him with her arms around him to steady him, and he had been sitting there for some little time. Q. Then after he made his mark in the presence of you and Mr. Minos Brittingham, what was done? Ans. We witnessed the will, Mr. Minos Brittingham and myself and signed the will. There was no stand in the room at that time and we simply stepped over into the adjoining room, right through the window in the other room, over on the

buffet and signed the will and witnessed it.   Q. Did you sign it together in the same place? Ans. Yes, sir.   Q. Was there a light on the buffet? Ans. Yes, sir.   Q. What kind of a lamp? Ans. It was a good sized lamp, a large nickel lamp, that gave out a bright light.   Q. From where you stood when you signed that, could you see Mr. Benjamin Brittingham in the bed? Ans. Yes, sir.   Q. Was there anything to prevent you from seeing, anything between? Ans. No, sir; absolutely nothing.   Q. Will you please describe just exactly the location of the bed, the location of the window, there was a window? Ans. Yes, sir.   Q. In the partition wall between these two rooms, you have said there was a door in between, will you please describe the relative position of the door, of the window, of the bed, of the place where Mr. Brittingham was sitting, and where you and Mr. Minos Brittingham signed as witnesses, describe exactly what these positions were? Ans. This room in which the bed was, was built a shed room on the other house and the shed built over it, and the window still left in there, and that far (indicating) from the window is a door; say, here is the side of the house, then the door, then a small space, then a window, then the wall, that is the partition between these two rooms, and the bed was in that room and the window between the bed and where we were signing.   We were over in the other room signing this and I could look right through that window and see Mr. Brittingham sitting on the bed in clear view, right through the window.   The curtain was up but the glass was down, but I could look through the lights and see the gentleman sitting on the bed.   Q. Was there anything the matter with his sight? Ans. I never detected it.   Q. Who took the will in from the bedroom in the adjoining room? Ans. Mr. Keys.   Mr. Keys was there and he took the will back to Mr. Bassett Brittingham.   Q. In your opinion, was Mr. Bassett Brittingham of sound and disposing mind and understanding and capable of making a valid deed or contract? Ans. He was."

This witness further testified that there was also a lighted

lamp in the bedroom on a small stand at the head of the bed on which there were also drinking tubes and medicine; that the witnesses signed the will about the middle of the buffet.

On cross-examination this witness said the conversation about the witnesses occurred after the testator had made his mark. This is concurred in by Minos Brittingham, the other subscribing witness. They both signed as witnesses to the mark and also as subscribing witnesses.

Minos Brittingham testified that when he arrived at the house on the evening of March 6th, 1923, he went through the kitchen into the sitting room next to the bedroom and took a seat in the sitting room opposite the window in the partition, and the door was open and Mr. Keys and Dr. Law were in the bedroom with the testator, and "I could see them and hear them just as plain as if you were in the other room and you could hear him talking and reading this will. I could see over his shoulder."

"Q. Who was reading the will? Ans. Dr. Law was reading the will. Q. Reading this paper you have just looked at? Ans. Yes, sir; and I heard them read it, so when they wound up, Mr. Wilmer Keys asked Bassett, my brother, would it be all right for Dr. Law and me to sign it and he said, 'Yes, all right, sign it,' and looked right through the window at them all the time and the door was open and I saw Bassett lean over near the paper there, after they got done reading I saw him lean over to make his mark, but I could not see him make his mark, and they took the paper and brought it out in the sitting room. Q. Did you see him take hold of the pen? Ans. No, sir; I could not see him take hold the pen. Q. But you saw him there lean over this paper? Ans. Yes, sir. Q. You could see the paper? Ans. Yes, sir. Q. And he was leaning over it? Ans. Yes, sir. Q. And after he did that, you heard Mr. Keys ask him if it would be all right for Minos and Dr. Law to sign it? Ans. Yes, sir. Q. You say you were looking over his shoulder? Ans. Yes, sir. Q. Then after Mr. Keys asked him if it would be all right for you and Dr. Law to witness it, what

was done? Ans. He brought the paper out in the sitting room. Q. Did they leave the bed there and come out through the door into the next room? Ans. Yes, sir; came out there to sign and I signed it on that buffet."

The witness further testified that the testator was sitting, at the time witness signed, about two-thirds of the way down towards the foot board; the head board was up against the east wall (the partition being on the north side of the bedroom); that witness saw him sitting there on the bed while witness was signing; that after the will was read over "I most think that he said 'that was the best will that I ever heard read or ever made,'" one or the other, and after that witness saw him leaning over; that witness and Dr. Law at the same time at the buffet, signed as witnesses to the mark and also as subscribing witnesses; that immediately after witness saw testator lean over the paper and "kind of leaned up" was when he said; it was all right for the witnesses suggested, to sign; that witness was almost ten or twelve feet from testator when he looked over his shoulder, that the buffet at which witness signed was against the east wall of the house in a line with the head of the bed; that there was only room enough between the bed and the partition for a person to pass.

The law as applicable to the facts of this case is as follows:

Where signature by testator is not made in presence of witness, a request by testator to the witness to witness the document or signature may be a sufficient acknowledgment of testator's signature. 40 *Cyc.* pp. 1121 and 1122, and cases cited in note 49.

An assent by testator that certain parties suggested as witnesses act as such is a sufficient request. *Mason v. Harrison,* 5 H. & J. 480; *Cramer v. Crumbaugh,* 3 Md. 501; *Higgins v. Carlton,* 28 Md. 141; *Etchison v. Etchison,* 53 Md. 357; *Gross v. Burneston,* 91 Md. 383; *Gans' Syllabus, Executors and Administrators,* p. 9; *Hinkley's Testamentary Law,* section 73.

We think the witness, Minos Brittingham, was present within the meaning of the statute, when the testator made his mark. But if not, the acceptance by testator, after making his mark, of Minos as a witness, and his direction to him to sign as such, was a sufficient acknowledgment of testator's signature.

As to the requirement that the witnesses sign in the presence of the testator. The subscription by such witnesses must be made within the unobstructed range of vision of the testator, although if he is able to see it, without any material change of position, the fact that he does or does not avail himself of the privilege is immaterial. And a subscription in an adjoining room may be capable of being seen by him. 40 *Cyc.* pp. 1123 and 1124, and cases cited in note 66; *Russell v. Falls,* 3 H. & McH. 457; *Edelen v. Hardey,* 7 H. & J. 61; *Mason v. Harrison, supra; Higgins v. Carlton, supra; Etchison v. Etchison, supra; Gans' Syllabus, Executors and Administrators,* p. 10; *Hinkley's Testamentary Law,* sec. 78.

It seems to us apparent, from the testimony above set out, that it was quite possible for the testator to have seen both attesting witnesses when they subscribed their names by merely turning his head, and that he knew they were in the act of complying with his request that they sign as witnesses.

Our conclusion, therefore, is that the will was duly executed and that there was no error in either of the rulings appealed from.

*Judgment affirmed*